**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ROMAG FASTENERS, INC.,** **Plaintiff,** | : | |
| **v.** | : | **No. 07-cv-1667 (JBA)** |
| **J.C. PENNEY, INC. and J.C. PENNEY CORP., INC.,** **Defendants.** | : | |

**RULING ON PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

On November 8, 2007, Romag's president serendipitously discovered handbags on sale at J.C. Penney's Milford, Connecticut store with magnetic snap fasteners bearing the words "ROMAG" and "USA Pat 5722126," which is the plaintiff's trademarked name for its patented magnetic snap fasteners. Following its November 12, 2007 cease-and-desist letter to J.C. Penney,[1] Romag brought suit, alleging patent infringement in violation of 35 U.S.C. § 271, trademark infringement in violation of 15 U.S.C. § 1114(1), unfair competition and false representation under the Lanham Act, 15 U.S.C. § 1125(a), and related state claims. Romag also moved for a temporary restraining order (TRO) and preliminary injunction, seeking to prevent defendant from selling any more handbags bearing its trade name and patent number on what it claims are counterfeit magnetic snap fasteners. For the reasons set forth below, the plaintiff's motion for a temporary

[1] For convenience, the two J.C. Penney defendants will be referred to in the singular.

restraining order will be granted.

Romag is a Connecticut-based manufacturer and seller of magnetic snap fasteners, used principally on handbags, on which it holds United States patent number 5,722,126. Romag is also the owner of United States trademark number 2,095,367 for the mark “ROMAG” on such magnetic fasteners. The plaintiff manufactures and distributes its fasteners under a licensing agreement with a Hong Kong-based company, Wing Yip Metal Accessories Manufacturing, Ltd., Ex. 4.

A TRO hearing was held on November 26, 2007, at which Romag President Howard Reiter testified that the license agreement obligates Wing Yip to pay a royalty on each fastener produced, in exchange for permitting Wing Yip to sell fasteners anywhere in Asia and Latin America, including to manufacturers who later import finished products containing Romag fasteners to the United States for retail sale. Mr. Reiter testified that Romag has never sold its fasteners to J.C. Penney, nor entered into any licensing agreement with J.C. Penney, nor otherwise authorized J.C. Penney to use Romag’s mark its patented magnetic snaps.

On November 8, 2007, Mr. Reiter browsed the handbag department of the J.C. Penney store in Milford, Connecticut, and while examining the magnetic snaps on some of the handbags for sale, discovered what he believed to be counterfeit snaps bearing the mark “ROMAG” and the lettering “USA Pat 5722126” on a number

of J.C. Penney's house brand handbags. He purchased the bags for further scrutiny, which confirmed his suspicion that the snaps were counterfeits with several flaws detracting from their quality. Their electroplated finishes were defective, the unsightly magnet was visible around the base of the well on one side of the snap, and the four bent tabs used to hold the decorative cover in place on the undersides of the snap components were inferior substitutes for Romag's continuous flange or rim. Mr. Reiter's uncontroverted testimony, based on his numerous and frequent inspections of Wing Yip's factories was that it does not possess the tooling to make magnetic snaps in the manner of the ones found on the Penney handbags, from which he concluded that the defendant's magnetic snaps were never authorized by Romag in any way.

J.C. Penney's senior buyer of handbags and small leather accessories, Lynn Terry, testified that the defendant sets forth specifications for handbag size and features for bidding by manufacturers who construct the bags for sale under various of J.C. Penney's house brands, but does not specify any particular brand of magnetic fastener to be used on its house brand bags. She further testified that the defendant was unaware of any problems or claims about the magnetic snaps until receiving Romag's cease-and-desist letter. Ms. Terry stated that the bags identified in Romag's complaint were manufactured by Inter Core

Ltd., a Hong Kong manufacturing concern which she estimates has supplied approximately 2.2 million of the bags bearing the "ROMAG" mark for sale nationally since November 2006. Of that number, Ms. Terry testified that approximately 400,000 are currently in stores, with 60,000 additional handbags in the defendant's warehouses awaiting distribution and 40,000 in transit. She has no knowledge refuting Mr. Reiter's testimony that the magnetic snap fasteners on the bags are counterfeits of Romag's patented snaps.

J.C. Penney understandably fears that an injunction against sale of the bags will severely affect its sales, since the Christmas shopping season represents twenty percent of its annual sales, as well as cause a loss of goodwill from customers being unable to purchase the bag which will be featured in J.C. Penney advertisements which cannot now be pulled. The defendant also fears an injunction will result in lost productivity of J.C. Penney staff, who would be required to find and remove the enjoined items. Ms. Terry testified that if enjoined from selling the bags in question, the defendant will have to assign an average of three people in each of its approximately 1,000 stores to identify the bags, pull them from the shelves, and record the bags' changed inventory status.

District courts are empowered to grant preliminary injunctive relief, in the form of a temporary restraining order

or a preliminary injunction, when the moving party "demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief," and either "(a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510 (2d Cir. 2005) (internal quotations omitted). However, the moving party bears the even higher burden of a "clear or substantial showing" of likelihood of success where, in relevant part, "the injunction sought will alter, rather than maintain, the status quo – i.e., is properly characterized as a 'mandatory' rather than 'prohibitory' injunction." Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996) (internal quotation omitted). The defendant claims that the higher standard is the applicable one for the relief plaintiff seeks. By either standard, the Court concludes that the plaintiff has prevailed.

In relevant part, the Lanham Act prohibits the use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). The Act similarly forbids the use in commerce of

"any word, term, name, symbol, or device, or any combination thereof . . . which is likely to cause confusion, or to cause mistake . . . by another person." 15 U.S.C. § 1125(a).

The Second Circuit has taught that in Lanham Act cases in which the plaintiff has moved for a preliminary injunction or a temporary restraining order, "both the likelihood of success on the merits and the potential for irreparable harm in the absence of preliminary relief may be demonstrated by a showing that a significant number of consumers are likely to be misled or confused as to the source of the products in question," Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1038 (2d Cir. 1992); see also Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005) ("[i]n trademark disputes, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm") (internal quotation omitted).

In Lanham Act cases in which the parties dispute whether the similarity of the defendant's product to the plaintiff's is "likely to cause confusion," disposition requires application of the multi-factor test set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961), and consideration of each factor:

> (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the

> defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers.

Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 391 (2d Cir. 1995). It is "incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." Id. at 400; see also New Kayak Pool Corp., 246 F.3d 183, 185 (2d Cir. 2001).

In the circumstances of counterfeit products, the Arrow Fastener mandate is met as to the actual-confusion and similarity-of-the-marks tests, since counterfeit items are intended to be highly similar to the authentic product by their nature, and provide no means for the public to distinguish between manufacturers. See Louis Vuitton, 426 F.3d at 537 (noting that when determining the likelihood of consumer confusion, "[o]f salient importance among the Polaroid factors is the 'similarity of the marks' test"); Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987) ("[i]ntentional copying gives rise to a presumption of a likelihood of confusion").

Here, the snaps on defendant's handbags are extremely close copies of the plaintiff's product, notwithstanding their flaws, and as well are designated as plaintiff's with plaintiff's mark and its patent number. The testimony of the patent inventor himself, Mr. Reiter — that a retail consumer would not be able to

tell the difference between the counterfeit snaps and the genuine articles, and that he was able to tell the difference only upon removal and close inspection of the J.C. Penney handbag snaps — is highly credible. Relying on Ms. Terry's testimony that handbag customers look for functionality, not snaps, and that J.C. Penney's customers are price conscious and do not overlap with the customers of plaintiff's high-end manufacturers and designers, defendant argues that there is no risk of actual customer confusion. This argument is misplaced, however, since the licensing agreement makes no such distinction on scope of distribution of plaintiff's snaps. Moreover, Mr. Reiter testified that his focus is on the potential response of his high-end manufacturing customers or potential customers, who he worries will be negatively influenced by the appearance of inferior "Romag" fasteners, because these customers represent his greatest profit center. The evidence at the hearing clearly demonstrated that the snaps found on the J.C. Penney bags are counterfeits which were successfully passed off as one-to-one substitutes for Romag's snaps for more than a year. On this record, consumer confusion as to the source of the snaps is virtually inevitable, and the plaintiff has therefore carried its burden of showing the likelihood of success on the merits and the potential for irreparable harm in the absence of preliminary relief.

J.C. Penney argues that its snaps pose no likelihood of consumer confusion because the high-end handbag designers whom Mr. Reiter worries will see knock-off Romag snaps on J.C. Penney handbags are extremely unlikely to ever shop at the defendant's stores; that retail customers buying either a high-end or J.C. Penney house brand handbag will not be able to tell the difference between the infringing snaps and the Romags; and that because in the year since the counterfeit snaps have been in the defendant's stores, there is no evidence of any actual resulting confusion. However, the defendant's phrasing misapprehends the consumer confusion factor in a way that would render trademark protection meaningless where, as here, the sophistication of the counterfeit is such that only the most carefully-trained eye could spot the fraudulent item. Given that the Lanham Act specifically forbids counterfeiting, the defendant's right to continue to sell the infringing merchandise – even if no one may ever notice that they have been sold a product with Romag knock-off snaps – cannot trump the plaintiff's right to exercise control over its registered trademark.

In the alternative, J.C. Penney argues that equity counsels against the imposition of an injunction more burdensome than the harm alleged by the plaintiff; that is, that the cost of complying with an order to remove the offending bags from the shelves of all Penney stores will greatly outweigh Romag's

forgone royalties or the value of the snaps. J.C. Penney relies on Constitution State Challenge, Inc., and Northeastern Open Invitational, Inc. v. Nyemchek, No. 3:00-CV-650, 2001 U.S. Dist. LEXIS 7773, at *23, 2001 WL 640417, at *7 (D. Conn. June 1, 2001), which cautions that harm to an enjoined party should be considered to ensure that injunctive relief is not "arbitrary and overly broad," nor vastly disproportionate to the harm to be alleviated by the injunction.[2] Here, the relief sought is focused specifically on the removal of specific handbags which contain designated counterfeit "Romag" snaps from J.C. Penney stores. From Ms. Terry's testimony, it is evident that the defendant knows precisely which handbag models are affected, and their quantities and locations.

The defendant also advances a market value argument in claiming disproportion of the relief sought, which does not adequately depict the balance of the equities in this case. While it has some superficial intuitive appeal, in light of Mr. Reiter's testimony that Romag snaps retail for between seventy-

[2] While the need for fashioning appropriate injunctive relief is well-grounded in the law of this Circuit, see, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 220 (2d Cir. 2003) ("[i]njunctive relief should be narrowly tailored to fit specific legal violations. Accordingly, an injunction should not impose unnecessary burdens on lawful activity") (internal quotation omitted), Nyemchek is better read as an illustration of a district court denying relief which is completely disproportionate to the harm alleged: there, in an attempt to halt an internecine dispute among dance competition judges, the plaintiff requested that the defendants be enjoined "from judging competitions anywhere in the continental United States or, alternatively, within an area north of the Mason-Dixon line and east of the Mississippi River," despite not presenting any "evidence to support the proposed, broad geographical constraints" requested, Nyemchek, 2001 U.S. Dist. LEXIS 7773 at *22, 2001 WL 640417 at *7.

five cents and three dollars each, in contrast to the average sale price of the J.C. Penney bags of about twenty dollars, and Ms. Terry's testimony that the defendant may lose approximately $7,000,000 in sales during the Christmas shopping season if denied the opportunity to sell its house brand handbags. The reality is that J.C. Penney's loss emanates only from being denied the opportunity to sell known counterfeit goods. Accepting defendant's argument would undercut the basic protections of the Lanham Act in every situation in which an infringer stands to make more money from its infringing activities than the mark holder will lose. The Second Circuit has made clear that a mark holder's ability to control use is the principal aim of the statute in question here; where a mark holder "never gave its consent to the use of the mark," it is entitled to relief from the unauthorized use of that mark. El Greco Leather Products Co. v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir. 1986).

The remaining Polaroid factors counsel the same conclusion: the strength of Romag's mark vis-a-vis the counterfeits is not in contention, given that the J.C. Penney snaps reproduce in entirety Romag's mark.[3] The proximity-of-the-products test and the "bridging the gap" test, both designed to shed light on

[3] Registered marks "are presumed to be distinctive and should be afforded the utmost protection." Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986).

whether the junior product will participate in the same market as the senior product, are answered by the identical appearance of the two items at issue in this case. Here, where the counterfeit snaps have been substituted for genuine Romag snaps on products which are normally the focus of the plaintiff's sales efforts, handbags, the infringing product is side-by-side with the genuine product in the market and has therefore "bridged the gap" into the market for genuine Romag fasteners.

As to the quality of the defendant's product and the sophistication of the buyers, the testimony at the TRO hearing demonstrates that the counterfeit is of sufficiently high quality so as to escape notice by all but the most careful examiner. Moreover, the steps which Mr. Reiter had to take in order to confirm his suspicion that the J.C. Penney snaps were counterfeits – prying back the material on the handbags and, in some cases, removing the snaps entirely in order to inspect their undersides – supports the conclusion that retail customers of any stripe (or, at least, those unwilling to destroy their handbags in order to satisfy their curiosity) will fail to notice the differences, and thereby conflate the source of the snaps in their minds.

Finally, as to the good faith of the defendant, while there is no evidence that defendant specifically intended to market infringing counterfeit products, the intent to infringe is clear

from the product itself, that is, it is nearly identical in appearance and designated by an express denomination as a Romag snap.

Thus, the Polaroid factors uniformly suggest that consumer confusion will be caused by the snaps on the J.C. Penney handbags. The plaintiff has therefore satisfied its burden of demonstrating irreparable harm in the absence of preliminary relief and a clear likelihood of success on the merits, and the Court turns to the defendant's request that Romag post security for the issuance of the injunction, in case the Court of Appeals should find that J.C. Penney has been improperly enjoined.

Fed. R. Civ. P. 65(c) specifies that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." A district court has "wide discretion to set the amount of a bond, and even to dispense with the bond requirement," Doctor's Assocs. v. Distajo, 107 F.3d 126, 136 (2d Cir. 1997); however, this Court is "required to make this determination before it enter[s] the preliminary injunction," Corning Inc. v. PicVue Elecs., Ltd., 365 F.3d 156, 158 (2d Cir. 2004).

At this embryonic stage of the litigation, a large bond does

not appear necessary: the temporary restraining order will have a maximum duration of ten days, after which the plaintiff must be heard on its motion for a preliminary injunction should that be necessary. In recognition of the shopping season in which this restraining order is issued, a $50,000 bond will be required for the duration of the temporary restraining order, subject to recalculation on a more developed record and briefing.

For the reasons set forth above, the plaintiff's motion for a temporary restraining order [Doc. # 3] is GRANTED. J.C. Penney and its officers, agents, servants, employees, and attorneys, and those acting in active concert or participation with them who receive actual notice of this order are temporarily restrained from selling and offering for sale goods bearing Romag Fasteners, Inc.'s federally registered mark "ROMAG" and/or its patent number, 5,722,126. Romag Fasteners, Inc. shall post $50,000 in cash or cash equivalent funds as security pursuant to Fed. R. Civ. P. 65(c), pending the hearing on its motion for a preliminary injunction. This order shall not expire until ten (10) days after the date of its entry unless extended for good cause shown.

IT IS SO ORDERED.

/s/

Janet Bond Arterton
United States District Judge

Dated at New Haven, Connecticut, this 27th day of November, 2007.